Case No. 15-1080, et al. Neustar, Inc. Petitioner v. Federal Communications Commission, et al. Mr. Shanmugam for the Petitioner, Mr. Gossett for the Respondent, and Mr. Karanja for Association Intervenor. Mr. Shanmugam, Assistant to the Attorney General for the Federal Communications Commission. Should I have him wait for me there? No, because they just say he's on the way, but we don't know where. Oh, they say he is on the way? Let's just keep going. Okay, go ahead. Thank you, Judge Taito. Kenneth Shanmugam of Williams & Connolly for Petitioner News Star. May it please the Court, in the Telecommunications Act of 1996, Congress ordered the FCC to select one or more entities to serve as numbering administrators. The sole statutory criterion for selection was that an administrator be an impartial entity, that is, that the administrator not be aligned with any particular industry segment or participant. That requirement was designed to serve the Telecommunications Act's overarching purpose of promoting competition by preventing the actuality or even the perception of preferential treatment by numbering administrators. In selecting Telcordia as the next local number portability administrator, the Commission improperly determined that Telcordia was an impartial entity, despite the undisputed fact that Telcordia's 100 percent owner, Erickson, is aligned with the wireless segment of the telecommunications industry and is itself a network equipment manufacturer. In its haste to move forward, the Commission dispensed with the requirements of notice and comment rulemaking, even though it underwent rulemaking when it selected News Star's corporate predecessor as one of the initial administrators. And in selecting Telcordia as the purportedly lower-cost option, the Commission relied on an unsupported assumption concerning the cost of the transition to Telcordia and arbitrarily refused to consider News Star's lowest offer. This was a flawed process with a seriously flawed result, and the Commission's order selecting Telcordia should therefore be vacated. I'd like to start with the argument about neutrality. Can I just ask you a technical question? The administrator makes sure that if someone shifts cell phone providers, they get to keep their number, right? Yes. That's what this is all about. Yes, so the administrator does more than that. The administrator is also effectively responsible for routing calls because it is the administrator's database that is used for that purpose. So this is a vitally important function. As this Court is aware, there are a number of different administrators. Wait, the administrator routes calls? So if I call you on my cell phone, it's the administrator that routes that call? The administrator maintains a database, which is used for— I'm just curious. My simple question is, why is this such a big deal? Well, it is a big— I couldn't tell from your briefs. It is a big deal for both of those reasons. The administrator is, of course, the one who is responsible if you were to switch providers for ensuring that that switch takes place. But the administrator, therefore— That would seem like such a huge technological task that costs billions of dollars. To simplify this perhaps grossly, the administrator is essentially responsible for linking your phone number to a particular carrier, such that if you were to call my house, the administrator's database would be used to establish that my house is served by Verizon, and therefore to ensure that the call goes through. And I think that this is actually important in one very specific— This is not legally relevant. I'm just curious. Well, it does go to the first argument here. And I think the premise of the first part of our argument on neutrality is that this issue of alignment, whether an aligned entity can serve as an administrator, is, in fact, a freestanding requirement. I think there's some back and forth in the briefs concerning the neutrality criteria that are set out in the regulations, and those are the criteria set out in Section 5212A1 in Romanetz 1, 2, and 3. And the interveners in particular seem to suggest that those criteria are the whole ballgame. But quite to the contrary, the regulations, and in particular the regulations specific to the local number portability administrator, require that the administrator not be aligned with any particular telecommunications industry segment, and the Commission itself has indicated that that is a freestanding requirement. And our first argument, as the Court is aware, is that that requirement is plainly failed here. The Commission itself did not dispute, and indeed it seemingly acknowledged at points in its order, that Ericsson, Telcordia's parent, is aligned with the wireless segment of the industry because it earns billions of dollars from contracts to manage the networks of and to sell network equipment to the major American wireless providers. Where the Commission went wrong, and we believe that this is a sufficient ground for vacating the Commission's order, is in paragraph 172 when the Commission said, quote, Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia. Does your argument mean to suggest that if you're in a situation where there's a parent on a wholly owned subsidiary, it can never pass the statutory test? Well, our submission is a much more modest one, Judge Edwards. It is simply that in that circumstance where you have a wholly owned subsidiary, you have to look to the affiliations of the parent in assessing whether the subsidiary is, in fact, an impartial entity for purposes of the statute. So you're saying the alleged error here is the FCC's failure to even think about it, other than to say that someone promised not to do anything wrong? That is correct with regard to the alignment argument. And just to be clear why we're talking about Delaware law here, we're talking about Delaware law because Telcordia is a Delaware company, and so its relationship with its parent, Erickson, is naturally governed by Delaware law. And we think that the commission in the paragraph I've just mentioned, paragraph 172, simply got Delaware law wrong where you have a wholly owned subsidiary. The duties of the directors, in fact, run to the parent as the sole shareholder. That is the Anadarko case and the other subsequent Delaware cases. Your argument is there's a complete unity of interest under Delaware law. There is. And, of course, that's the broader principle, Judge Edwards, from which the specific principle that the duties of the directors of a subsidiary run to the parent flows. The broader principle is that where you have a wholly owned subsidiary, there's a unity of interest between the parent and the subsidiary. And if you look at footnote 593, which is attached to paragraph 172, this is page 1951 of the joint appendix, the commission goes on to say, Even to the extent that Erickson is aligned with the wireless industry, as that term is understood in our neutrality rules, it does not follow that Telcordia is so aligned. And so this error of Delaware law, which I would note parenthetically, was induced by an opinion letter from Telcordia's counsel, which mischaracterized where the duties run, pages 855 to 856 of the joint appendix. That error was really the source of the problems with the commission's analysis. So does your entire argument depend on us agreeing with you that the commission misunderstood Delaware law? Suppose we don't agree with that. If you don't agree with us, we have the other arguments on impartiality. But I just want to be clear, Judge Tatum, we are relying both on the specific principle of Delaware law regarding the duties of the directors of a subsidiary. If I didn't agree with you about that, then what's your argument about why we would overturn the commission's judgment about its view of the effectiveness of these criteria for impartiality? So first, Judge Tatum, just to be clear, to the extent that the commission is relying on these purported safeguards. Well, they call them safeguards. Well, I'm happy to call them safeguards for purposes of this colloquy. We don't believe that safeguards can address a problem with the alignment requirement. And the commission in its order was really relying on the safeguards to address a separate problem under Romanet 3 of the regulation I mentioned earlier, namely that there is a specific requirement that an administrator not be subject to undue influence by parties with a vested interest. Now, leaving aside for the moment whether those safeguards were sufficient, and as the Court is aware, we have a separate argument that the commission acted arbitrarily and capriciously by failing sufficiently to investigate Erickson's business relationships in concluding that those safeguards were sufficient. The commission points us to the language in the regulation which says, notwithstanding these criteria, that is the ones you're talking about, the commission may determine that a party is not subject to undue influence. But Judge Tatel, that solely goes to the question of the interplay between Romanet 3 and Romanet 1 and 2. The commission has consistently taken the view, and I don't really read their brief to suggest otherwise, that this requirement concerning alignment is a threshold requirement. And just to be clear, that is a requirement for selection. It doesn't merely govern your conduct after you are selected. In order to be selected as the administrator, you have to not be aligned with a particular segment of the industry. And the commission has never, never said that safeguards can cure a problem with alignment. This goes to the question of whether a particular entity is eligible to be selected. Now, to be sure, if after this Court were to vacate the commission's order, if Talcordia were to come back and say, we have reconstituted ourselves, we are no longer wholly owned by Erickson, then, yes, sure, the analysis for whether they are eligible to serve as the administrator would be different. But our submission here is really a straightforward one. It is, first, that alignment is, in fact, a distinct, discrete requirement, which has always been the commission's view. And, second, that that is a problem that cannot be cured by safeguards. And, again, the commission has never taken a contrary view. And the only other thing I would add on this, and this is a little bit down in the weeds if we're not down in the weeds already, is that this alignment requirement is actually the only requirement in the regulations that, by its terms, applies to the local number portability administrator, with the exception of the requirement concerning network equipment manufacturers, which I'm going to get to with the Court's leave in a second. That requirement, the alignment requirement, is in 5221K. The three Romanets in 5212, by their terms, only apply to the North American numbering plan administrator. And in the order, the commission unilaterally said, we're now going to apply those to the local number portability administrator as well. And I would note, parenthetically, that that is yet another reason why this should have all gone through notice and comment rulemaking. The commission effectively amended the regulation to apply to local number portability administrators as well. For present purposes, my point is simply that, again, alignment is a separate and threshold requirement. Now, if you disagree with our submission on that point, Judge Tatel, I would revert to my second argument on impartiality, my argument concerning the network equipment manufacturer requirement. That is a requirement that, in our view, is incorporated through Section 5226A, which is a provision that applies specifically to the local number portability administrator, and it, by the commission's own concession, incorporates the recommendations of the selection working group report. Now, the interveners deride our argument as a connect-the-dots argument, but with all due respect to the interveners, there are not really a lot of dots to connect here. Our submission is quite straightforward. It is that in Section 5226A, the commission carved out certain recommendations that are not incorporated, and to the extent that the commission makes the argument that the requirement concerning network equipment manufacturers is not, in fact, a recommendation, I would respectfully submit that is belied not only by Section 4 of the selection working group report, but also by Section 6, which recommends adoption of the process for selecting the administrator. And the commission itself, in the second report and order, made clear that the report's, quote, recommendations on number portability administration, end quote, included recommendations regarding, quote, how the administrator should be selected. So to use your phrase, Judge Tatel, the extent that this is a triple cushion shot because we're relying on the fact that there are, in fact, three relevant provisions here, the regulation, Section 6 of the report, and Section 4 of the report, the fact remains that as a matter of intellectual logic, the requirements of Section 4 have to be incorporated. And quite frankly, I think that that is a straightforward and independent basis on which to vacate the commission's order. I know that my time is short. Would you go on to notice and comment? I took up some of your time with my question about technology. So would you say something about notice and comment? And I guess in particular, is it your view that if a regulation is required to be issued pursuant to notice and comment, that any action implementing that regulation must also be notice and comment? No, Judge Tatel, I don't think that that's our submission. What is your precise argument? I think our precise argument is that what took place here was effectively an amendment of the prior selection. And let me explain why that's so, because I think that the interveners dispute that proposition. Our view is first that the initial selection of the administrators did, in fact, occur through notice and comment rulemaking based on the same regulation to which I adverted just a minute ago, Section 5226A. And indeed, the commission's own actions at the time of that initial selection confirmed that the commission itself thought, contrary to the commission's suggestion now that there was an adjudicatory component, that in fact the very selection of the new administrators was a part of the notice and comment rulemaking process. But since then, it's selected administrators without notice and comment, hasn't it? Well, I don't think that that's quite true, Judge Tatel. I think that what the commission did in the Warburg order was essentially to confirm the propriety of the successor, in fact, of the original administrator continuing to serve as the administrator. And I think that's somewhat different from the selection of an entirely new administrator. Now, the interveners suggest that because there was effectively a time limit on the selection of the initial administrators, that what's going on here is not really an amendment. But I think that the problem with that, and it gets back to my answer a few minutes ago, is that what the commission is doing in this process is determining eligibility and propriety to serve as the administrator. The issue of the term of the contract is a matter for negotiation, and the commission, of course, is sometimes aware of that and sometimes confirms that. But ultimately, all that the commission did in its initial order was to say here are two entities that can serve as the administrator. And what the commission did this time around was to say we are going to say that this other entity is going to be allowed to serve as an administrator subject to the execution of an appropriate contract. And, of course, our argument here doesn't rest solely on the argument that there was an amendment of the prior rulemaking. Our argument is also that the agency was exercising legislative authority here. It was exercising its authority under Section 251, an authority that the Supreme Court itself has recognized is an authority that has to be exercised through regulation. And our argument is also, as the Court is aware, that this decision was one that had solely future effect. It did affect thousands of parties, thousands of providers who are beholden to the administrator and subject to the administrator's requirements. Okay, thanks. We'll hear from the commission. Thank you. Thank you, Your Honors. David Gossett from the Federal Communications Commission. The commission reasonably approved the Advisory Committee's determination that Telcordia should be the next administrator of the number portability system. The analysis was conducted under the three-part test in Section 52.12 of the regulations. And as the commission noted, since those regulations were created in 1997, that's how the commission has analyzed the neutrality of every administrator, the number portability or otherwise. That's in Paragraph 160 of the order. The commission went through the three parts of that analysis and determined that Telcordia was appropriately neutral and impartial. Section 52.21, which Mr. Shammigan points to, is not a separate test. That provision uses the same language as 52.12 to set forth the basic principle of neutrality. That's what the impartiality language is. And if you look at the language of Section 52.12, it links that introductory clause to the word accordingly, accordingly in analyzing the neutrality of a given potential administrator. We look at these three factors, whether it's affiliated with the telecommunications service provider, whether it issues a majority of its debt or obtains a majority of its income from a TSP, and the general notwithstanding whether an entity fits under one of those two, is it appropriately neutral? That's how the commission analyzes this question. And that's what the commission did here. Let me give you my concern. You know, whether we can quibble over the preciseness of the corporate law that may or may not be in play here really is not an unknown notion that a parent and its wholly owned subsidiary have complete unity of interest. And the commission here seems to suggest, well, corporate law has no play, except the commission, as I read your papers, did indulge in notions of corporate law principles, and this is one of them, and your explanation falls flat here. There's no analysis of Erickson that I can see, and how Erickson being what it is would affect the impartiality that's required. I mean, merely to say that the board of directors of the person or the group that got the award promises to be good is to say nothing as far as I can see under the law. What the commission said in paragraph 172 is that given the conditions imposed in this order, we thought that telecordial. What are the conditions that address what I think is a valid concern that a parent and a wholly owned subsidiary have complete unity of interest, and the board of the subsidiary has to be faithful to the parent? Let me answer that question in two fashions. First, let's talk about Delaware corporate law for a second. I mean, I do think this is a question of federal law. It's a question of whether they're impartial, but as to Delaware corporate law, the Trenwick decision that's cited in the briefs discusses how a subsidiary's board is entitled to support a parent's business strategy unless it believes pursuit of that strategy will cause the subsidiary to violate its legal obligations. That's at 906A2-174. Here, Telcordia has specific legal obligations to ensure that it is neutral in engaging in the administration of the number portability system. It's part of the code of conduct. It's part of the obligations imposed by this order. But let's then talk about the various conditions because as the commission explains, the commission has never looked at the question of neutrality of a given administrator in the abstract. It has looked at it in light of all the facts and circumstances and in light of the conditions imposed. So there's never been a situation like this? Respectfully, Your Honor, there has. Even assuming that's true, don't you have to then analyze Erickson, what it does, what it's about, and the nature of the relationship between Erickson and Telcordia? I mean, you're wanting to override a corporate principle by saying, well, but the subsidiary has legal obligations, and we're reading that to say they promise to be good. They promise not to cause any problems with respect to neutrality. This doesn't seem to make sense if you've not analyzed the relationship between Erickson and Telcordia, and you didn't here. We did. We acknowledged that they're wholly unsubsidiary, but we insisted on the creation of an independent board. We insisted on a voting trust to appoint the independent board of directors. We insisted on a code of conduct. We insisted on a neutrality audit every six months to ensure the compliance of— Did that negate their— Good morning, Your Honor. My apologies. No worries. I was not aware of the construction that went on on the road and got caught in terrible traffic. Good morning. I should have allowed for it, and I apologize. I'm sorry, Your Honor. Did that negate the legal obligations that otherwise exist with respect to what the subsidiary owes to the parent? The subsidiary owes a corporate obligation, as I explained from the Trenwick decision, to operate in the interest of the parent, but that is not an obligation to trump other legal obligations, such as the obligation to, in this case, administer the system impartially. I mean, there's a legal obligation to maximize a corporation—the parent's profit, just as there's a legal obligation to maximize the profit of any corporate, whoever the shareholders of a corporation are. But that's a separate question from whether it is reasonable for the commission to conclude, under 5212, that this administrator will be adequately impartial among telecommunications service providers. I mean, that's the question. I also do want to point out that this is not the first time that the commission has dealt with a situation where there is a wholly owned subsidiary. In fact, the commission ordered the creation of a wholly owned subsidiary to administer the billing and collection agent. That's at JA444 to 445. There was a situation where the parent corporation was determined to be impartial—to be partial. It was biased in favor of incumbent local exchange carriers, and the commission's solution to that was to say, let's insist that you create a wholly owned subsidiary with an independent board. That's the way the commission has always analyzed these questions, is to look at the specifics of the circumstance. That's why 5212A13 has this loosey-goosey, notwithstanding language, because these are factual questions. This is a determination of, do we, as the expert in this area, believe this company will be impartial? It's also, therefore, important to note that the way this process worked is that the advisory committee, which is made up of representatives of wireless carriers, wireline carriers, VoIP providers, consumer representatives, they recommended the selection of Telcordia as the administrator. This is not a recommendation that the commission invented out of whole cloth. It's not the case that any specific portion of the industry is here before the court today saying, we think this is a biased provider. We endorse that. In fact, as the briefs point out, in the course of this process, in the course of the request for proposal process, Newstar specifically said, that's a great way for you, and I didn't use those words, but that's an appropriate way for you to determine neutrality, because the advisory committee and this consortium that will have the contract, they're the people who pay for this contract. They're the people who, therefore, are appropriately situated to determine whether this potential administrator is appropriately neutral. Turning, if there are no further questions on the neutrality, well, one other, if there are no further questions on that, I do want to talk briefly about the rulemaking issue that Judge Tatel raised. First, I think it's important to stress that the commission believes this argument is untimely. The May 2011 order that laid out the process did not state that there would be a rulemaking. But it didn't say anything. It just said the commission will act, right? It iterated the Bureau, so why? Yes. Right? That's all it said. It didn't say the commission wouldn't do notice in time. It just said it would act appropriately. Yes, Your Honor. So why were they obligated to say anything at that point? Sorry. The draft request for proposals that followed shortly thereafter, that order, which the commission released for public notice, provided for no more than six weeks between a recommendation from the advisory committee to the FCC and the FCC's announcement of the decision of who should be the administrator. And that's at JA 670. Newstart affirmatively supported that process. The final RFP, again, had a six-week period. I think it's – this Court is well aware that it's essentially impossible to have a notice in time rulemaking in a six-week period. So my point is not that – my point is simply that Newstart was well aware, until it reached a situation where it was concerned about the outcome of this, that there was not going to be a rulemaking. This is an argument created ex post, and that's what the reason we think is untimely. Beyond that, it was entirely reasonable for the commission to conclude that this should be done via an adjudication. It was the sort of decision that is inherently in the discretion of an agency, and it was just like it's reasonable to award a license by making an order, not through noticing how it rulemaking. So, too, it's reasonable to say you're going to administer this process, not the other person. Beyond that point, also, in its brief, Newstart makes the argument that all adjudications must have retroactive effect. This Court's conference group decision that's cited in the briefs is inconsistent with that. In that circumstance, the FCC specifically determined that an adjudicatory decision would be entirely prospective, and the Court affirmed that. In my remaining 50 seconds, I just want to make one more point on the neutrality point. The commission here created an extensive series of conditions. Some were proposed by Telcordia. Some were imposed by the commission to ensure the impartiality and neutrality of this administrator. Mr. Shanmugam, as far as I can tell, thinks that no set of conditions could possibly have sufficed to ensure the impartiality of this administrator. He's not the party. I'm sorry, Newstart. If I call counsel by name, he's not the party. You're arguing against him. I've known Mr. Shanmugam for a long time. I did not mean in any way for it to be an assertion against him. We were summer associates together 20 years ago. But my point is that Newstart seems to be taking the position that there's no set of conditions that could possibly create impartiality, and that's just simply not the way the commission has ever understood this process. Every time it has looked at the question of the neutrality of an administrator, any one of the five or six separate administrators we've had, we've looked at the specifics of the circumstances, the conditions created, and an analysis of the risks of possible bias in that process, and that's exactly what we did here. Now, you said at one point in your argument that there's nothing to indicate that they're, in fact, biased. That can't be the test. We're talking about a threat of bias, not actual bias, right? Yes, of course. I didn't mean to imply that. This is why the commission assumed for the sake of argument that Erickson might be biased in paragraph 172. It did not find it. It pointed out that there were questions as to that. The commission probably assumed that there were some concerns about neutrality. The commission assumed that there are significant concerns. They ought to. I think that's what I'm reading here. They assumed there are concerns about neutrality because you have a wholly owned subsidiary. We do understand that normally we don't expect complete neutrality in that circumstance. Respectfully, I disagree. The commission assumed for the sake of argument. I mean, when Lockheed Martin became— Do you agree with the proposition that where you have the wholly owned subsidiary, there would be at least a danger of an appearance of conflict of interest? I was making a slightly separate point. You're arguing that you're just aligning that all that's Delaware law. I'm not understanding that. The commission assumed there was clearly a problem with neutrality. Respectfully, I— You seem to be saying, no, not at all, and I don't get it. Well, a wholly owned subsidiary and the parent is in the business that we're talking about? Respectfully, my point was actually that the parent is not directly in the business. I mean, under 52.12, if the parent were a telecommunications service provider, that would be a fairly strict ban under subpart one of that test. Here, the arguments are that they're aligned with the wireless segment, they're an equipment manufacturer. Those are all a step removed from actually a parent. And, of course, when the commission selected Lockheed Martin as the Newstar's corporate predecessor as the administrator, it determined that Lockheed Martin actually was a telecommunications service provider, but said it was not enough of a bias that it was going to allow it nonetheless under subpart three of the test. Here, what the commission did was say, look, Newstar is making arguments about Erickson, about the corporate parent. Assuming for the sake of argument that this equipment manufacturer relationship or an alleged bias towards the wireless industry were sufficient to create a question as to Erickson, here we think Telcordia is sufficiently insulated from that connection by the lengthy set of conditions and the lengthy set of protections that we've created. I mean, I would point the court to the appendix to the order, J, 1963 to 64, where the commission went through all of these separate conditions that were imposed. I mean, and not only is it the independent board and the voting trust and the neutrality audit, it's also requirements of legal obligations to be neutral, requirements not to share information, requirements not to share employees. It's a lengthy series of protections precisely because even assuming that there might be a general, even acknowledging that the corporations are one of the wholly-owned subsidiary of the other, here is isolated from that protection. I mean, under Delaware law, it's not the case that a corporation always has, a wholly-owned subsidiary always has sole obligations to the corporate parent. That's why cases have said that, for example, in the case of bankruptcy, they might have other obligations. And here, too, so if there's a circumstance where there are another source of reason to think that the wholly-owned subsidiary would have separate obligations, like, for example, bankruptcy, then you can look beyond the general principle that a wholly-owned subsidiary exists to do the business of the parent. Here, the order here, the legal obligations created here are separate legal obligations that help isolate it. I don't understand why you're resisting at that point. Do you really think you can win? You can have us write an opinion on that point? You can have us write an opinion that says the wholly-owned subsidiary does not have a duty to its parent? I was not making that as my principal argument, Your Honor. My point is that what the commission concluded was that, given the – and this is the end of Paragraph 172, the paragraph which addresses fiduciary duty, we reject the claim that here there is undue influence, particularly when considered in conjunction with the conditions imposed in court. It doesn't have to be undue influence to create a conflict of interest or an appearance of conflict. And you seem to be trying to defend something that's not the proposition that you're going to win on. I don't understand why you're making that such an important part of your argument. I mean, I came late to the party, but that's most of what I've heard is you trying to say that a wholly-owned subsidiary doesn't have a duty to its parent. It is coming across that way half the time at least, and that's why I'm trying to listen to you carefully. If your argument is, look, I thought you were going to say, look, the commission understood there's a question of neutrality here and they doubt about that there's a possibility – a possible question of neutrality, and we attempted to deal with it. And here are all the conditions, and we think that addresses it. But you seem to be fighting the notion – you're not listening to yourself. We're listening to you. I realize that. So maybe you don't mean to say – I don't mean to be fighting that notion. I mean to be making the prior point that we are – It clearly is a question of neutrality. Of course – Well, it's the first time you've said it, of course. There's a question of neutrality every time we've looked at any administrator. Every time we've looked at any administrator, there are these sorts of questions. The focus of the argument has to be, yeah, we accept that claim, but we've nullified it with conditions that we think work. I'm sorry. I thought that's why I was pointing to the last sentence of paragraph 172. That's exactly my point. You're saying it more clearly than I am, obviously, but that was my point, is that we've looked at it. If one takes a step back, of course the parties that are going to be qualified to operate this contract are going to have all sorts of connections into the telecommunications industry. It's a very complicated contract, and the parties that are going to be technically qualified to handle it are going to have all sorts of business relationships. We're not likely to find a new party that's never done anything in this sphere who we're going to select. I was right there in saying, therefore, the commission realized there was a possibility of an appearance, at least, of non-neutrality, and they dealt with it. That's exactly right, Your Honor. That's what the contract tells us, that there wasn't any problem. Can I adopt that as my final sentence? I would hope so, and it's a good period on it, instead of a continuation telling us why it's not your position. Thank you, Your Honor. You see the clarity of Judge Edwards and Judge Sentell is why we get paid so much. Thank you, Your Honors. Should we hear from the intervener? Go ahead. May it please the Court, my name is Peter Karandjian for the interveners. First, I'd just like to reiterate we completely agree with that reading of what the commission did here. Remind us just for background, the interveners are? I'm here representing CTIA and U.S. Telecom. It's a very broad cross-section of the industry. I think in that regard, Your Honor, it's helpful to recall at bottom these rules are all about protecting the industry as a whole from bias or favoritism on the part of the LNPA. That's a point Newstar itself recognized early in the process. Newstar wrote a letter to the FCC, for example, back in October 2012, and it said the judgment about whether the LNPA is sufficiently neutral to satisfy the demands of the industry is a judgment the industry should make subject to commission review for satisfaction of the commission's rules. That's a JA-719. And, Your Honor, we submit the industry has made that judgment. If you think who really has skin in the game here, it's the industry. It's all of these carriers. Together, my two clients, the associations, represent almost 200 different carriers and suppliers. They're not just wireless companies. They're wireline companies. They're ISPs. They're large carriers. They're small carriers. And they all have, as represented by the associations, lined up behind the FCC saying, We don't see a neutrality problem here. Now, I'm not saying that's sort of per se the legal analysis, but I think it should inform the legal analysis because, at the end of the day, the commission created these rules for the industry and actually wrote into the regulations an unusual role for the industry. That's why the Numbering Council was created. It was created to give the industry a particular voice here. And I think that's an important part to recall when looking at these types of questions because they are necessarily predictive and they require judgment calls. As I think Judge Edwards put it quite rightly, that this is about anticipating basically a risk of bias. And that's a judgment call. It's predictive. And it calls for a lot of expertise. You really have to understand how the numbering system works. Now, I do want to say one thing about the Delaware law. We'll be prepared to say, for the sake of argument, we'll assume that Neustar's correct. As a general matter, a director of a subsidiary owes fiduciary obligations to the parent.  Neustar itself. I would hate to try to defend the shareholder derivative act in which they took an opposite position to that. Did we take an opposite position, Your Honor? No. You said that you will accept for purposes of argument. I don't see why that is for purposes of argument. A director of a wholly owned subsidiary corporation owes a fiduciary duty to his shareholder just as any other director owes to his shareholder. I think the only quibble we have, Your Honor, is we maintain that there are obligations owed to both the subsidiary itself and the parent. And Neustar says, no, it's just the parent. I don't think that happens. Well, if it's wholly owned, then I'm not sure how you can make that distinction and why you bother trying. I understand, Your Honor. I mean, the one reason is one court pointed out if you had just one other minority shareholder, it would be a bizarre proposition to say you could essentially have a director engaging in corporate waste or some other bad act and owe no fiduciary duty whatsoever to the corporation whose board that director sits on. So we say, look, there are obligations running both ways. But I think the key point is in Trenick, America, which my friend Mr. Gossett pointed to. And I'm just going to quote from that opinion. It was written by the Delaware vice chancellor, who is now the Delaware chief justice. The Delaware Supreme Court affirmed on his opinion, and he said this, a subsidiary board is entitled to support a parent's business strategy unless it believes pursuit of that strategy will call the subsidiary to violate its legal obligations. I'll give you one more quote. Delaware law does not embrace the concept that a director of a wholly owned subsidiary owes a duty to second guess the business judgment of its parent corporation. As Judge Edwards quite aptly put it, I think what the commission was really saying is, look, we get this whole argument about wholly owned subsidiary. We think these protections are sufficient. And they include Erickson itself saying to the commission, we will do whatever it takes to get neutrality. We stand by this code of conduct. So for a Telcordia director to say, I am going to rely on my own notion of what's in Erickson's interests and violate that code of conduct, that would not only be an act of disloyalty to the parent, it would be an act of open defiance of what the parent itself has said. No reasonable director could exert his or her fiduciary duties and violate that code of conduct which Erickson has imposed. And I think under those circumstances, those particular facts, the code of conduct, the voting trust, everything else, the separation of business operations, I think we have to look not at this abstract level of what some general fiduciary obligation is, but what are the protections in this case? And we submit the commission did a sufficient job putting protections in place and explaining that those protections would work. Thank you. Did counsel have any remaining time? Okay. You can take two minutes. Thank you, Judge Tatel. In its brief, the commission primarily argued that to the extent that there is an alignment requirement, that requirement is in fact satisfied in this case because the commission in fact expressed a differing view of Delaware law. And we are content to rest on our brace. What's your response to the intervener's argument that, look, this consortium is the telecommunications industry, and this is the arrangement that satisfies them? With respect, those consortia are dominated by the very large wireless carriers that, in our view, give rise to the appearance, at a minimum, of bias. And a variety of smaller carriers, in fact, raised objections before the commission. So I think with all due respect. They're not here, though, are they? They are not here. And quite frankly, I suspect that they have far more limited resources than organizations like CTIA do. But whatever the explanation, the mere presence of interveners cannot be dispositive. Now, I said that the commission primarily. I didn't suggest it was dispositive. I just asked you what you thought about their role here. Well, and I think that they are here in part because they are the very beneficiaries of having one of their primary clients serve as the administrator. Indeed, the longtime CEO of Ericsson has been a longtime member of the board of CTIA. I don't say that to suggest that you should discount their views either. My view is simply that they have skin in the game, as Mr. Karanja suggested. Now, I do want to say just a word about the commission's argument on this issue of alignment, because I think that this is, with all due respect, the central issue in the case. The commission had previously argued that the alignment requirement was satisfied because of its characterization of Delaware law, and I'm content to rest on our briefs on the proposition that the duties of the directors, in fact, run to the parent except in the discrete context of insolvency. But what I heard my friend and former colleague, Mr. Gossett, arguing for the commission this morning was quite different. He was arguing that alignment is not, in fact, a discrete requirement and that Romanetz 1 through 3 set out the sole meets and bounds of the neutrality argument. And with all due respect, that has never been the commission's position until about 15 minutes ago. It was not the commission's position even in its brief. And if I could refer the court to one source on rebuttal, it is to paragraph 18 of the Warburg order at page 483 of the joint appendix. Quote, in addition to meeting the commission's requirements set forth in the regulation, the NANPA, the relevant administrator, must be impartial and may not be aligned with any particular telecommunications industry segment. It would be bad enough. You seem to be arguing, as you did earlier, and I can't find any support for it, that if you have wholly owned subsidiary or an apparent in a situation like that, you cannot cure the problem of potential bias with conditions. And I don't see anything in the law that supports that. And you're ignoring the conditions. It seems to me that the relevant argument here is whether having recognized a threat to neutrality, the commission dealt with it. And your argument when you first started was they can't cure it. If you find this arrangement, it's done. And you said the only way they could do it was to go back and restructure the corporation. I don't understand where that's coming from. That is because of the purpose of this alignment requirement, Judge Edwards. No, but you're suggesting now that that fits with your notion of the purpose before you said that's what the rule says. I can't find a rule that says that. Well, just to be clear, I mean, to step back, neither the statute nor the regulation makes any provision for safeguards. Right, so now we have to look to see whether the agency is arbitrary and capricious in saying we understand there's a neutrality obligation, we're addressing it, and here are the conditions, and we think they're sufficient. That should be the vital. Well, just to be clear, Judge Edwards, I mean, first of all, the commission has never said that an alignment problem can be cured for safeguards. So if the commission were, in fact, doing that here, it would be doing it for the first time. Now, that's not the end of the analysis by any means, but I do think that if you take a look at the commission's order, what it purported to be doing, and after all, we're in Chenery Land here, was addressing an undue influence problem with safeguards. To the extent the commission was discussing safeguards, it was discussing it in the context of the requirement in Romanette 3. And I think with all due respect, I think that's why we hear the commission today trying to write the alignment requirement out of the regulations altogether. We are not disputing the proposition that if you have an undue influence problem, it can be addressed with safeguards. But again, the issue of alignment is an eligibility requirement. It's not just a conduct requirement. It governs the threshold question of whether you can get in the door in the first place. And just to illustrate why the commission's argument proves too much, the commission happily accepted the lifeline that Judge Santel offered in his last question argument. But I think that lifeline proves way too much because if you accept the proposition, Judge Edwards, that an alignment problem can, in fact, be addressed with safeguards, there would be no barrier whatsoever to Erickson itself serving as the administrator here because Erickson does not qualify under the commission's view as a telecommunications service provider that would itself be disqualified. And critically, the commission … Well, then we wouldn't have to deal with that case if it ever came up. But we don't have to deal with that case to resolve this case. But, Judge Tatel, that proves why it cannot be that an alignment problem can be cured with safeguards. And the last thing I would say on this particular issue, Judge Edwards, is that even assuming that it could be, we don't think that the safeguards at issue address the relevant problem, which is that the duties of the directors would remain to Erickson as the parent. And having a voting trust and having a code of conduct and all these other safeguards that were in the appendix, to which Mr. Gossett pointed, do nothing to alter the operation of those duties. So even assuming arguendo that you could have safeguards, we think that the safeguards here would plainly be insufficient. And the last thing I would say on this point, and indeed in the argument, is simply that if you agree with us that an alignment problem cannot be cured with safeguards, then we think that the appropriate remedy has to be to disqualify Talcordia, at least as it's currently constituted, because the commission itself, in this order, recognized the threat of bias. In paragraph 181, it stated, quote, Erickson's managed services contracts and equipment sales revenues are worth considerably more than its bid for the administrator contract. So it is conceivable that Erickson might be tempted to prioritize its managed services contracts and sales over the administrator contract. Given that recognition, it is simply inexplicable that the commission somehow thought that any alignments that Erickson had were irrelevant to the analysis. And for that reason, and because Erickson is also a network equipment manufacturer, we respectfully submit that the commission's order should be vacated and the matter remanded to the commission so that it can conduct proper proceedings. Thank you.  The case is submitted.
judges: Tatel, Edwards, Sentelle